IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE NATIONAL STOCK EXCHANGE )
)
       Plaintiff )
)
    v. )    No. 1-06-cv-01603
)
FEDERAL INSURANCE COMPANY )    Honorable Ronald A. Guzman
)    Magistrate Sidney I. Schenkier
       Defendant )

## **NOTICE OF FILING**

TO:   James H. Kallianis, Jr.
       Garry L Gassman
       MECKLER BULGER & TILSON LLP
       123 North Wacker Drive
       Suite 1800
       Chicago, IL 60606

PLEASE TAKE NOTICE that on the 27th day of September, 2006, we had filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Chicago, IL, PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT,

a copy of which is attached hereto and herewith served upon you.

THE NATIONAL STOCK EXCHANGE

By: _____ s/Suzanne J. Prysak _____
         One of Its Attorneys

J. Kevin McCall
Suzanne J. Prysak
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 527-8404 Fax

John J. McCoy
Theresa H. Vella
TAFT, STETTINIUS & HOLLISTER LLP
425 Walnut Street,
Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
(513) 381-0205 Fax

## CERTIFICATE OF SERVICE

I, SUZANNE J. PRYSAK, an attorney, hereby certify that I caused the foregoing NOTICE OF FILING and its accompanying document to be served upon counsel listed thereupon by having true and correct copies thereof sent to them via electronic delivery this 27th day of September, 2006.

s/Suzanne J. Prysak
SUZANNE J. PRYSAK

CHICAGO_1404521_1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| THE NATIONAL STOCK EXCHANGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 1603 |
| | ) | |
| v. | ) | Judge Guzman |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

The National Stock Exchange ("NSX") seeks coverage under its Directors and Officers insurance policy issued by Federal Insurance Company (the "Policy") for costs incurred on behalf of its current and former officers related to an SEC investigation. Such coverage is clearly provided for under the terms of the Policy and precedent of this Court. In its response to NSX's Cross-Motion for Summary Judgment, Federal tries to avoid the Policy's clear language by arguing that (1) an SEC investigation does not constitute a "Claim" as an "administrative or regulatory proceeding," and (2) the SEC investigation in this case was not a proceeding against an "Insured Person for a Wrongful Act." Both of these arguments are specious. The authority cited by both parties and, more importantly, the Policy itself identify these types of SEC investigations as administrative or regulatory proceedings. In addition, the investigation in this case was clearly directed against NSX's officers ("Insured Persons") as well as NSX for violations of securities laws ("Wrongful Acts").[1] The strained interpretation of the Policy and

---

[1] Federal also repeatedly asserts that NSX is not entitled to entity coverage under the Policy, however such argument is nothing more than a red herring because this action and this motion are not seeking entity coverage. This motion seeks only a determination that there was a claim against the insured officers; how much of the defense costs are

irrelevant case law outside of this jurisdiction advanced by Federal must give way to the clear and unambiguous terms used in the Policy as further supported by similar cases decided by this Court.

As an initial matter, it bears repeating that the Policy defines "Claim" in relevant part as "a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, against any **Insured Person** for a **Wrongful Act**, including any appeal therefrom." (Stipulated Facts ¶ 6, Exh. 1 at 9.) Under Illinois law, this Court is to interpret this Policy to give effect to the intent of the parties, construing the policy as a whole and taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 292-93, 757 N.E.2d 481, 491 (2001). Under Illinois law, a contract must be interpreted to give effect to all terms of the contract. *LaSalle Nat'l Trust, N.A., U/T 116555 v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996). Further, any ambiguity in the language of the Policy is construed strictly against the insurer and in favor of the insured. *Traveler's Ins.*, 197 Ill.2d at 292-93, 757 N.E.2d at 491.

## A.   An SEC investigation is an "administrative or regulatory proceeding."

Contrary to Federal's strained interpretation, an SEC investigation clearly constitutes a claim under the Policy as an "administrative or regulatory proceeding." (Stipulated Facts ¶ 6, Exh. 1 at 9). Federal's entire argument on this point is its unsupported assertion that an "administrative proceeding" is distinguished from an SEC investigation, thereby removing investigations from the definition of a covered Claim. This argument ignores the dispositive

---

properly allocated to the officers rather than NSX is an issue of fact which is not before the Court on this motion and need not be decided for purposes of this motion.

terms included in the Policy, and the authority Federal cites in support to make such a distinction is completely irrelevant and has nothing to do with the interpretation of insurance policies.

Black's Law Dictionary (7th ed. 1999) sets forth the plain and ordinary meaning of "administrative proceeding" to include a "hearing, inquiry, *investigation*, or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative" (emphasis added). Rather than applying the plain meaning of the terms in the Policy, Federal cites to various SEC regulations, specifically those which distinguish the procedural rules followed by the SEC during investigations and administrative adjudicative proceedings, to support its claimed distinction between SEC administrative proceedings and investigations. These regulations have no bearing on the terms used in an insurance policy, which must be construed in accordance with their plain and ordinary meaning – not in accordance with specific regulations that are not incorporated into the policy. NSX has previously discussed the irrelevance of the SEC regulations cited by Federal (see footnote 4 in Cross-Motion) and will not repeat that discussion here. Notably, however, the regulations certainly do not support Federal's attempt to replace the Policy language "administrative or regulatory proceeding" with "adjudicative proceeding." *See Minuteman Intern., Inc. v. Great American Ins. Co.*, 2004 WL 603482 at *5-7 (N.D. Ill., March 22, 2004) (rejecting insurer's attempt to create similar dichotomy between enforcement proceeding seeking relief and investigation leading up to request for relief).

That an SEC investigation is an administrative proceeding was sufficiently self-evident that it was not worth contesting for the parties in *Foster v. Summit Medical Systems, Inc.*, 610 N.W. 2d 350, 354 (Minn. App. 2000) ("The parties agree that the SEC investigation is an administrative proceeding . . .") or *Minuteman Intern.,*, 2004 WL 603482 at *4 ("Defendant [insurer] does not dispute that the SEC proceeding met the requirement of being . . . an 'administrative . . . proceeding'").

3

Even under Federal's misguided interpretation of the Policy's language regarding "administrative proceedings," the Policy would still provide coverage for costs incurred to defend the SEC investigation as a "regulatory proceeding." In all of its arguments relating to administrative proceedings, Federal conveniently ignores the fact that the Policy covers administrative *or* regulatory proceedings as Claims. The SEC is a regulatory body. The Random House Dictionary of the English Language (2d ed. 1987) defines "proceedings" as "2. a series of activities or events; happenings. . . . 5a. the instituting or carrying on of an action at law. b. a legal step or measure." Under the Policy's plain terms, an SEC investigation is a regulatory proceeding: an activity, event, action at law, legal step or measure taken by a regulatory body pursuant to the laws and regulations that set forth its powers to conduct such investigations.

Federal has failed to set forth any assertion or authority to support a colorable argument that an SEC investigation is not a regulatory proceeding. Indeed, one Supreme Court case cited by Federal actually compares two separate forms of SEC *regulatory* proceedings -- "investigatory proceedings" and "adjudicative proceedings" -- for purposes of Due Process. *Hanna v. Larche*, 363 U.S. 420, 446-48 (1960).[2] Moreover, the very SEC regulations upon which Federal so heavily relies refer to SEC investigations, such as the one at issue, as "Formal Investigative Proceedings." *See* 17 C.F.R. § 203, Subpart B; 17 C.F.R. § 203.5 ("Unless otherwise ordered by the Commission, all formal *investigative proceedings* shall be non-public.") (emphasis added).

---

[2] The *O'Brien* decision cited by Federal merely indicates that "administrative investigations" by the SEC are not adjudications. *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984).

As set forth in more detail in NSX's opening memorandum, the interpretation advanced by Federal would render other terms in the Policy meaningless; a result which is contrary to the basic rules of interpretation of any agreement. The Policy explicitly states that an "administrative or regulatory proceeding" may be commenced by not only a "notice of charges" but also "a formal *investigative* order or similar document" (emphasis added). As an investigative order is used to commence an investigation (as opposed to an adjudication, which would be commenced with a "notice of charges"), an investigation must be an administrative or regulatory proceeding covered by the Policy if the language concerning "a formal investigative order or similar document" is to have any meaning. *See LaSalle Nat'l Trust*, 76 F.3d at 144 (noting that contracts are construed to give effect to all terms). To the extent that Federal is trying to create ambiguity in this unambiguous provision, any ambiguity must be resolved in favor of the insured under Illinois law. *Traveler's Ins.*, 197 Ill.2d at 292-93, 757 N.E.2d at 491.

There can be no serious doubt that at the time the parties entered into the contract, they clearly understood that a Claim would include investigations among administrative or regulatory proceedings. Federal's position to the contrary is incredulous given that the Policy expressly refers to an "investigative order" as part of the definition of a Claim. Federal's interpretation renders the terms "formal investigative order or similar document" absolutely meaningless. Moreover, its baseless attempt to read "adjudicative" into the Policy and "investigative" out of the Policy is patently unreasonable and demonstrates its bad faith.

**B.    The SEC investigation was a proceeding against NSX officers for wrongful acts.**

Perhaps acknowledging that the SEC investigation constitutes an administrative or regulatory proceeding under the Policy, Federal is left with the argument that the defense costs are not covered until the SEC expressly charged individual officers with wrongdoing. Specifically, Federal argues that the notices and orders relating to the SEC investigation did not

target individuals and did not institute a proceeding, rather merely informed of a potential future proceeding. These arguments ignore the clear language of the SEC notices and orders and the nature of an investigation.

The SEC investigation was a proceeding against the NSX officers ("Insured Persons") for violations of securities laws ("Wrongful Acts"). According to its October 22, 2003 notification letter of an investigation, the SEC specifically identified Insured "present and former directors …[and] officers" as targets of the investigation because they were expressly included in the definition of NSX for purposes of the investigation. (Stipulated Facts ¶ 12, Exh. 3.) The letter even went on to identify particular officers whose performance and compensation were being specifically investigated in connection with "compliance, regulatory, or market surveillance responsibilities," including David Colker, Jeffrey T. Brown, and Robert Ackermann, among others. The SEC specifically requested documents related to these individuals. *See Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461, 436 (8th Cir. 1990) (even though a subpoena in a grand jury investigation was directed to the bank, the documents demanded related to the officer's conduct as a bank official).

This letter followed the SEC's inspection report of October 16 noting "serious deficiencies" (i.e., securities violations or "wrongful acts") in NSX's regulatory programs. (Stipulated Facts ¶ 11, Exh. 2.) The SEC then commenced a formal regulatory proceeding to investigate the wrongdoing by NSX's officers as well as NSX. The subsequent SEC formal investigation was a proceeding against the officers, who were targets of the investigation in addition to NSX, for wrongful acts committed by them with regard to the regulatory programs.[3]

---

[3] The Policy clearly covers suspected Wrongful Acts under investigation and a notice of charges is not required to trigger coverage; coverage may be triggered by a "formal investigative order or similar document."

The SEC's formal investigative order of February 5, 2004 states unequivocally that the SEC was investigating wrongful conduct and was doing so to determine whether NSX, which had previously been defined to include the officers, or "any other persons," which would certainly include the officers through whom NSX acted and who would have been engaged in any wrongdoing, were engaged in violations of securities laws. (Stipulated Facts ¶ 13, Exh. 4.) Federal's argument that the officers were not targets of the SEC investigation are particularly disingenuous in light of the Wells letters issued shortly thereafter on May 25, 2004, which made it painfully obvious that the officers were being investigated as well as NSX. (Stipulated Facts ¶ 14, Exh. 5.) Both before and, particularly, after these letters, defense costs were incurred to protect these officers in these regulatory proceedings; it is these costs, precisely the type which the Policy was intended to cover, which Federal now attempts to avoid.[4] NSX's officers, including David Colker, Jeffrey T. Brown, and Robert Ackermann, were the targets of an SEC investigative proceeding against them for wrongful acts in violation of securities laws. As such, they are entitled to coverage under the Policy.

Federal also tries to import much significance to the SEC's boilerplate language in its notices and orders concerning not construing the letters or the matters under investigation as reflecting upon any individual or entity. The SEC clearly suspected Insureds of Wrongful Acts and commenced proceedings to investigate such wrongdoing, otherwise there would have been no investigation. Such language signifies nothing more than the concept of "innocent until proven guilty." Federal also makes a misguided attempt to argue that the investigation was

---

[4] After dismissing as irrelevant treatises cited by NSX to show that it is not surprising that the parties contracted for Policy coverage for SEC investigations, Federal itself cites three cases for the uncontroversial proposition that a D&O policy does not cover lawsuits filed against a corporation where no wrongful conduct was alleged, investigated, or claimed against the officers. *See Highwoods Prop., Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917 (8th Cir. 2005); *Bank of Carbondale v. Kansas Bankers Sur. Co.*, 755 N.E.2d 543 (Ill. App. 2001); *Nat'l Bank of Ariz. v. St. Paul Fire & Marine Ins. Co.*, 975 P.2d 711 (Ariz. App. 1999). By contrast, in this case NSX's officers were undoubtedly subject to a regulatory proceeding investigating their alleged wrongful conduct.

7

brought for purposes of determining whether future proceedings *should* be brought, and that the Wells notices themselves do not bring an action against the named individuals, but rather informed the individuals that the SEC "intends to recommend" charges against them.

Federal's interpretation is not supported by the language of the Policy and improperly constricts the meaning of the term "Claim" through a narrow reading of the term "Wrongful Act." Although an administrative or regulatory proceeding must be commenced against an Insured Person, there is no requirement that a Claim under subsection (d) seek a determination of liability or otherwise seek damages or other relief against an insured. Accordingly, Federal's position that a claim does not arise until the SEC filed a complaint is incorrect. If Federal wished to limit the scope of coverage in this manner, it could have defined the terms more narrowly. For example, it applied a more narrow provision in subsection (a) by requiring a written demand *for money damages*, as opposed to non-monetary relief.

The correct reading of the Policy is that coverage is available for defense costs incurred in connection with the SEC's investigatory proceeding where the alleged Wrongful Acts concern one or more Insureds. This interpretation is supported by cases where the Courts, in considering similar circumstances under policies, found that defense costs incurred by officers in responding to investigations and subpoenas were covered claims. *See, e.g., Minuteman Intern.*, 2004 WL 603482 (holding that indemnified employees were entitled to coverage for defense costs incurred in responding to SEC investigatory orders and resulting subpoenas for deposition testimony and production of documents on the grounds that even thought an SEC investigation never resulted in an enforcement action against employees, it still constituted a claim under the policy); *Richardson Electronics Ltd. v. Federal Insurance Company*, 120 F.Supp.2d 698, 701 (N.D. Ill. 2000) (finding that a DOJ investigation constituted a claim because the officers and directors were required to comply with various demands for testimony and the production of documents);

8

*Polychron*, 916 F.2d at 463 (holding that the mere fact of investigation was sufficient to create a claim and rejecting insurer's argument that under D&O policy a claim would only exist if the grand jury indicted the officer after being investigated; insurer's characterization of the investigation as mere requests for information "underestimates the seriousness of such a probe").

Moreover, Federal's argument has been previously rejected by this Court in *Harbor Ins. Co. v. Continental Illinois Corp.*, 1989 WL 152648 (N.D. Ill. Nov. 30, 1989), *rev. on other grounds*, 922 F.2d 357 (7th Cir. 1990), in which Continental sought reimbursement for legal fees paid on behalf of officers and directors relating to an SEC investigation. As in this case, the facts in *Harbor Ins.* involved an SEC formal order of investigation to determine whether any violations of the securities laws had occurred and subsequent Wells notices to certain officers and directors of the company. *Id.* at *1. The SEC later initiated an administrative action against the company and entered a consent order, however, unlike this case, the administrative action did not name any individuals. Just as Federal does here, the insurer argued that defense costs incurred in defending against *threatened* SEC enforcement proceedings were not covered under the policy. Notably, the policy at issue in *Harbor Ins.* contained the similar language of "wrongful act" in the definition of a claim.

This Court rejected the insurer's argument reasoning that the purpose of a D&O policy is to "reimburse the insured when it is required to pay out money in defense of its officers and directors." *Id.* at *4. To hold that a D&O policy would "not reimburs[e] the company when the charges are only *threatened* and not filed, would encourage litigation and larger expenses." *Id.* (emphasis added). Moreover, it would subject insureds to charges of failing to mitigate damages should it not settle before a claim is officially filed. *Id.*

Accordingly, this Court has already determined that defense costs incurred pursuant to an SEC investigation constituted a covered claim under similar facts and similar policy language as in this case. There is no compelling reason to deviate from such holdings under the facts at hand.

## C.      Precedent supports coverage of SEC investigations like that in this case.

The decisions in *Minuteman*, *Richardson*, and *Polychron* all demonstrate the courts' broad construction of "claim" to include regulatory investigations of officers in order to give effect to the intents of parties to D&O policies. As it did in its motion for summary judgment, Federal reiterates the same insignificant distinctions between this case and this Court's decision in *Minuteman Intern.*, 2004 WL 603482. Federal first argues that the *Minuteman* policy included entity coverage. This is irrelevant because the Court found that the officers themselves were covered by the policy as well. Second, Federal inflates the importance of differences between the *Minuteman* policy and the Policy in this case. The *Minuteman* policy's language requiring that "relief" be sought to establish a claim constitutes a higher hurdle to coverage than that in the present Policy, where the Policy explicitly provides for coverage of proceedings against insured officers for wrongful acts which are commenced by a "formal investigative order or similar document." An investigation of the officers for wrongful conduct need not include any claim for "relief" by the SEC to constitute a claim in this case. As in the more restrictive policy in *Minuteman*, the SEC investigation of NSX's officers for wrongful conduct constitutes a claim.[5]

*Richardson* and *Polychron* also support the existence of coverage. Despite Federal's objection that the policy in *Richardson* did not define "claim," that decision is still instructive on the proper scope of coverage, as this Court found in *Minuteman*. In *Richardson*, a Department of

---

[5] Federal also argues the proceedings commenced by a "formal investigative order or similar document" in this case did not implicate NSX's officers. This argument is addressed in section B, *supra*.

CHICAGO_1455475_1

Justice criminal antitrust investigation involving the issuance of subpoenas to Richardson employees was found to fall within the coverage of the policy, despite the fact that the policy in that case, unlike the present Policy, made no explicit reference to investigations. *Richardson Electronics*, 120 F.Supp.2d 698; *see also Polychron*, 916 F.2d 461. Such constructions of D&O policies to include regulatory investigations are appropriate in order to give effect to the intentions of the parties. But no broad construction of the Policy is required to find coverage here because the Policy explicitly covers regulatory proceedings against an insured for a wrongful act where the proceeding is commenced by a "formal investigative order or similar document."[6]

**D.** **Legal fees incurred prior to the February 5, 2004 order or the May 19, 2005 complaint are covered losses under the Policy.**

The Policy defines "Defense Costs" as "reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses . . . incurred in defending or investigating Claims . . ." Contrary to Federal's position, the Policy's definition of "Defense Costs" does not require that the "Claim" be recognized prior to the investigation and defense. Because such costs are commonly incurred prior to the filing of charges in order to mitigate or avoid the subsequent costs and damages, Federal's interpretation risks defeating the very purpose of the Policy. The present case provides a stark example. Almost all of the Defense Costs of David Colker were necessarily incurred prior to the May 19, 2005 filing of charges in an attempt to avoid an extended and expensive trial or agency enforcement proceeding and to avoid the imposition of much greater liability. Such a pattern will commonly occur when SEC

---

[6] The cases cited again by Federal to support its narrow definition of claim continue to be irrelevant since they involve significantly different and more restrictive policy language. The only valuable lesson to take from those cases is that a court should look to the policy language to determine the scope of its coverage. *See JB Oxford Holdings v. Certain Underwriters at Lloyd's London*, 2001 WL 1190498 (Cal. App. 2001); *St. Paul Mercury Ins. Co. v. Foster*, 268 F.Supp.2d 1035 (C.D.Ill. 2003); *Center for Blood Research, Inc. v. Coregis Ins. Co.*, 305 F.3d 38 (1st Cir. 2002). (For discussion of these cases, see NSX's Cross-Motion for Summary Judgment at 14). In this case, the Policy explicitly covers investigations against officers for wrongful conduct.

CHICAGO_1455475_1

investigations commence, and this is the very risk that NSX entered into the Policy to insure against.[7] To accept Federal's interpretation would defeat the purpose of the Policy, contrary to Illinois law. *See Traveler's Ins.*, 197 Ill.2d at 292-93, 757 N.E.2d at 491 (finding that court should give effect to intent of parties, taking into account type of insurance purchased, nature of risks involved, and overall purpose of contract).

Applying such reasoning to David Colker and the other NSX officers being investigated would allow Federal to unjustly benefit from the Defense Costs expended to mitigate or avoid costs and damages for which Federal would ultimately be liable and would defeat the object of the Policy, which was to provide insurance to the officers in SEC proceedings against them for wrongful acts. *See Polychron*, 916 F.2d at 463 ("[The officer] hired an attorney to aid in his defense as the target of a grand-jury investigation. Thus, the fees charged by the attorney were reasonably incurred in 'defense of . . . claims' under the loss provision of the policy."); *Liberty Mutual Insurance Co. v. Continental Casualty Co.*, 771 F.2d 579, 586 (1st Cir. 1985) ("pre-suit services were correctly considered as part and parcel of the defense against the liability suits"); *State of New York v. Blank*, 745 F.Supp. 841, 852 (N.D.N.Y. 1990) ("Regardless of the date upon which the complaint was actually filed, [the insurer] has an obligation to reimburse [the insured] for all defense costs which he incurred for services rendered which are useful in defending against the first-party complaint. . . . Common sense argues that [the insurer] is *benefited* by the early actions taken by [the insured] to defend this action and, thereby, ultimately reduce any potential assessment of damages."). Like the insured officers in each of these cases, the NSX officers were the targets of the SEC investigation, as discussed in section B, *supra*, and are entitled to reimbursement of Defense Costs. Certainly, no defense costs would be owed if a

---

[7] To avoid any confusion concerning coverage of these costs arising from investigations prior to the filing of a notice of charges or complaint, the parties explicitly included the language "formal investigative proceeding or similar document" in the Policy; Federal now argues that the Policy does not cover investigations.

CHICAGO_1455475_1

Claim never came into existence, but Federal once again is using an unreasonably narrow interpretation of the Policy to avoid almost all of the defense costs even of David Colker, whom it admits was subject to a claim, as well as the other NSX officers who were targets of the investigation – at the same time, Federal has benefited greatly from the Defense Costs expended in defending NSX's officers during the investigation.

Federal's interpretation of the Policy would eviscerate the D&O coverage for which NSX paid by denying it substantially all of the costs of defending its officers against an action by the SEC. The interpretation would defeat the very purpose of the Policy.[8] Even if this Court were to find that a claim did not arise until February 5, 2004 or May 19, 2005, NSX is entitled to the Defense Costs incurred prior to those dates in defending NSX's officers.

**E.    Federal's interpretation of the Policy is patently unreasonable and its denial of coverage unreasonable and vexatious.**

There is no bona fide dispute over the existence of coverage in some amount prior to May 19, 2005 in this case. Federal's argument that an SEC investigation is not an administrative or regulatory proceeding and that the investigation was not against the officers of NSX as well as NSX is patently unreasonable in light of the language of the Policy, the authority cited by the parties, including Federal itself, the fact that the documents commencing the proceeding included the officers in the definition of the target of the investigation, and, significantly, the fact that three officers actually received Wells letters indicating that they were being investigated for wrongful conduct and may be charged. Federal's interpretation is a bald attempt to avoid coverage for SEC investigations of officers despite the obvious intent of the parties to provide

---

[8] NSX's "twisted allocation theory" (Federal's Response to Cross-Motion for Summary Judgment at 14), which was adopted by the Ninth Circuit in *Safeway Stores, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn.*, 64 F.3d 1282 (9th Cir. 1995), is that where defense costs are expended on the officers, they are entitled to coverage under the Policy, even if NSX may also benefit. As NSX will ordinarily benefit in some way from the defense of its officers, any other approach would rob NSX of any coverage of its officers. Federal's objection to the application of *Safeway* apparently goes back to Federal's fundamental misinterpretation of "Claim" under this Policy to exclude the SEC investigation of NSX's officers.

13

coverage for investigations commenced by a "formal investigative order or similar document" and the SEC's obvious targeting of NSX officers in its investigation. This patently unreasonable interpretation of the policy is a violation of 215 I.L.C.S. 5/155 as a matter of law. *See Harleysville Lake States Ins. Co. v. Boller Constr. Co., Inc.*, 2005 WL 1323321, *3 (N.D.Ill. 2005) ("[Section 155] relief may be appropriate if [the insurer's] failure to settle the underlying claim was due to an unreasonable and vexatious interpretation of the insurance policy, rather than a 'bona fide dispute . . . regarding the scope of the insurance coverage.'"); *Stamm v. Provident Life & Accident Ins. Co.*, 2000 WL 20713, *5 (N.D.Ill. 2000) (awarding attorney fees under section 155 where insurer's interpretation of policy was clearly inconsistent with terms of policy).

In conclusion, NSX's officers are entitled to coverage from October 22, 2003, or at the latest, February 5, 2004 for Defense Costs arising from the SEC investigative proceeding against them. NSX respectfully requests that this Court grant its Cross-Motion for Partial Summary Judgment on the issues of coverage and unreasonable and vexatious delay.

September 27, 2006                    THE NATIONAL STOCK EXCHANGE


By: _____s/Suzanne J. Prysak_____
           One of Its Attorneys

           J. Kevin McCall
           Suzanne J. Prysak
           Jenner & Block LLP
           One IBM Plaza
           Chicago, IL 60611
           Phone: (312) 222-9350
           Fax:    (312) 527-8404

OF COUNSEL:

John J. McCoy
Theresa H. Vella
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
Fax:   (513) 381-0205

CHICAGO_1455475_1

## TABLE OF EXHIBITS

1.     *Harbor Ins. Co. v. Continental Illinois Corp.*, 1989 WL 152648 (N.D. Ill. Nov. 30, 1989)

2.     Definitions

**EXHIBIT 1**


►

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
HARBOR INSURANCE COMPANY and Allstate
Insurance Company, Plaintiffs,
v.
CONTINENTAL ILLINOIS CORPORATION, et al.,
Defendants.
**No. 85 C 7081.**

Nov. 30, 1989.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

*1 This case is now before the court on cross-motions for summary judgment on count five of defendant Continental Illinois Corporation's ("Continental's") counterclaim. Count Five is a claim by Continental for reimbursement of certain legal fees paid on behalf of several Continental officers and directors in the course of an SEC investigation. Continental moves for summary judgment for payment according to the terms of a D & O insurance policy with plaintiff Harbor Insurance Company ("Harbor"). Codefendant Allstate Insurance Company ("Allstate") joins in Harbor's motions and briefs. Harbor cross-motions for summary judgment raising four arguments why Continental is not entitled to recovery on the policy: (1) Continental failed to give notice and seek consent about the charges; (2) no "claim" was made against the directors and officers; (3) there was no indemnification of Continental's officers; and (4) the alleged wrongful acts occurred after the policy period. The court finds that there are essentially no disputed issues of material fact and that Continental is entitled to judgment as a matter of law on its counterclaim.

*I. FACTUAL BACKGROUND*
The parties appear to agree on the essential facts unless otherwise noted. On August 24, 1981 Continental purchased a D & O policy from Harbor which provided Continental and its officers and directors with $15 million per year of insurance for certain covered losses. In July 1982, Continental announced a loss for the second quarter of the year, largely as a result of approximately $1 billion worth of participations in oil and gas loans that the Bank had acquired from Penn Square Bank in Oklahoma. [FN1] Shortly thereafter, the Securities and Exchange Commission ("SEC") issued a formal order of private investigation of Continental to determine whether there had been violations of the federal securities laws; specifically whether there had been insider trading violations or violations regarding disclosures concerning Continental's financial condition prior to the closing of Penn Square Bank in July 1982. Later, in 1984, Continental experienced additional problems in the form of a severe liquidity crisis which ultimately led to an assistance agreement with the Federal Deposit Insurance Corporation. The SEC followed with an amended order to expand the scope of its investigation to include the reporting of Continental's loan loss reserve in the time period after July 1982. By letter dated August 3, 1984 Continental notified its insurance carriers about occurrences which could form the basis for future claims including claims by the SEC and claims against present or former officers or directors. *See* Continental's Rule 12(e) Statement, Exhibit 6, p. 3.

In May 1985 the SEC staff in Chicago informed Continental's attorneys that the SEC Chicago was considering recommending that enforcement proceedings be initiated against Continental and five of its present or former officers. Each of the five named individuals retained legal counsel to advise him and to prepare a "Wells Submission" to forward to the SEC in Washington in an attempt to persuade the SEC that such an enforcement action should not be brought. Continental advanced the attorneys' fees and expenses incurred by the individuals in connection with the SEC investigation, paying a total of $384,263.01. The SEC investigation was concluded in 1987 with the commencement of an administrative proceeding against Continental and the entry of a consent order. No individual officer or director was named in that proceeding. Because they were successful on the merits or otherwise in avoiding a threatened proceeding, the officers were entitled to indemnification under Continental's charter.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. *ANALYSIS*
### A. Notice and Consent

**\*2** Some of Harbor's most weighty arguments center around the notice and consent requirements in the policy. Harbor argues that Continental failed to notify Harbor of the SEC claim and failed to obtain Harbor's consent to incur expenses as required by the policy. Continental responds that it did in fact give sufficient notice and Harbor was not prejudiced by the lack of consent. The court agrees with Continental for the reasons expressed hereafter.

#### 1. Notice

Harbor's position is based on paragraph 7(b) in the policy reading:

If during the policy period or during the discovery period, if any, claim is made against the directors or officers, the insured shall as a condition precedent to its rights under this policy give to the company notice as soon as practicable in writing of any such claim.

Continental's Rule 12(e) Statement, Exhibit A, ¶ 7(b).

Continental argues, however, that it satisfied another notice clause in the policy, paragraph 7(c)(ii) which provides:

If during the policy period or during the discovery period if the right is exercised by the insured in accordance with clause 8(a): ...

(ii) The insured shall become aware of any occurrence which may subsequently give rise to a claim being made against the directors or officers in respect of any such wrongful act;

And shall in either case during such period give written notice to the company of the receipt of such written or oral notice under (i) above or such occurrence under (ii) above, then any claim which may subsequently be made against the directors or officers arising out of such wrongful act shall for the purpose of this policy be treated as a claim made within the period of this policy.

Continental's Rule 12(e) Statement, Exhibit A, ¶ 7(c)(ii). Continental claims that its letter of August 3, 1984 satisfied the clause 7(c)(ii) requirement by giving Harbor notice of the occurrence that later gave rise to the claim. Harbor responds that Continental was required to submit two notices: one giving

notice of the occurrence to establish coverage during the policy year and a second notice to satisfy paragraph 7(b) when the claim arose.

The court finds that the policy is somewhat ambiguous regarding whether a second notice must be sent to satisfy paragraph 7(b) when a claim arises if notice under ¶ 7(c)(ii) has already been provided. Such ambiguities are always interpreted against the insurance company who authored the contract. *See, e.g. Garman v. New York Life Ins. Co.,* 501 F.Supp. 51 (N.D.Ill.1980). Specifically, paragraph 7(b) by its terms applies only to claims made during the policy period or the discovery period, not to claims made later. The later made claims are however covered by the policy pursuant to the terms of paragraph 7(c)(ii). Thus, the insurance policy fails to clearly require two notices.

Further, under the type of policy involved here, Harbor was not prejudiced by lack of a second notice. This policy does *not* include a duty to defend clause. Thus, failure to notify had no effect on Harbor's ability to perform its own obligations under the contract. Instead Harbor had an absolute obligation to pay all fees and expenses incurred so long as they were reasonable. The notice necessary to fix coverage within the policy period was accomplished by the August 3, 1984 letter.

**\*3** Illinois courts generally follow the "prejudice rule"--which provides that insurance companies must show prejudice from breach of a policy term in order to bar recovery by an insured--in a wide variety of cases. *See M.F.A. Mutual Ins. Co. v. Cheek,* 66 Ill.2d 492 (1977) (breach of duty of cooperation clause); *Marsh v. Prestige Ins. Group,* 58 Ill.App.3d 894 (1st Dist.1978) (consent to settlement clause); *Mulholland v. State Mutual Automobile Ins. Co.,* 171 Ill.App.3d 600 (5th Dist.1988) (consent to settlement clause). However, in the area of notice clauses some courts have found the prejudice rule not controlling or of lesser significance. *See Sisters v. Interstate Fire & Casualty Co.,* 117 Ill.App.3d 158, 162 (5th Dist.1983) (collecting cases); *Casualty Indem. Exchange v. Village of Crete,* 731 F.2d 457, 459 (7th Cir.1984). In notice cases courts hold that "prejudice is a factor to be considered only where the insured had a good excuse for the later notice or where the delay was relatively brief." *Casualty Indem. Exchange v. Village of Crete, supra* 731 F.2d at 459.

Here, Continental argues that it had a good excuse for not giving Harbor a second notice: Harbor had sued Continental in a case involving the same factual

situation. Giving Harbor information about a confidential SEC investigation could have been damaging to Continental and the five individuals in the Harbor suit. The court finds that in the situation involved here, where the parties were engaged in heated and vitriolic litigation, Continental has a reasonable excuse for not providing Harbor with a second notice when the claim arose. Accordingly, because Harbor was not prejudiced in any way, breach of the notice clause is excused.

2. Consent

Harbor additionally argues that Continental failed to comply with policy paragraph 6(a) which reads:

No costs, charges and expenses shall be incurred without the consent of the company, which consent shall not be unreasonably withheld;

Continental's Rule 12(e) Statement, Exhibit A, ¶ 6(a). Continental does not dispute that it failed to obtain Harbor's consent before it paid the individuals' legal fees. Instead Continental again argues that Harbor was not prejudiced by this breach.

The court sees no reason why the Illinois prejudice rule should not apply to the consent requirement here. Illinois courts have applied the rule in cases involving breaches of similar contract provisions. *See supra,* p. 6 Here, Harbor was in no way prejudiced by Continental's failure to obtain Harbor's consent. Harbor was required to pay the legal fees so long as they were reasonable. Harbor does not argue here that those fees are unreasonable. Even if Harbor did feel the fees were unreasonable, Harbor could challenge them now and would not be in any worse position for the lack of consent. Accordingly, Continental's acknowledged failure to secure Harbor's consent to incur legal fees does not bar Continental from recovery under the policy.

B. The "Claim"

*4 Next, Harbor argues that the expenses incurred here are not covered by the insuring clause of the policy at issue. Specifically, Harbor interprets the insuring clause as covering only claims for money actually filed against officers and directors. Thus, Harbor maintains that expenses incurred in defending against a threatened SEC enforcement proceeding are not covered.

The policy language agrees to "pay ... loss ... arising from any claim or claims made during the policy

period against ... [directors or officers] by reason of any wrongful act ..." Continental's Rule 12(e) Statement, Exhibit A, pg. 1. Relying on the Sixth Circuit's interpretation of a similar clause in *MGIC Indem. Corp. v. Home State Sav. Ass'n.,* 797 F.2d 285 (6th Cir.1986), Harbor argues that the language requires a filed claim for money. Although the Sixth Circuit case does support Harbor's argument, this court declines to follow it. The purpose of this type of insurance policy is to reimburse the insured when it is required to pay out money in defense of its officers and directors. A policy of not reimbursing the company when the charges are only threatened and not filed, would encourage litigation and larger expenses. Indeed, failure to settle before a claim is officially filed would aggravate the amount of loss and could be grounds for charges of failure to mitigate damages.

Finding coverage here is consistent with other language in the insuring clause which limits reimbursement to situations where the insured is:

required or permitted to indemnify the director or officer for damages, judgments, settlements, costs, charges, or expenses incurred in connection with the defense of any action, suit or proceeding to which the directors or officers are a party or with which they are threatened.

Continental's Rule 12(e) Statement, Exhibit A, pg. 1. The court believes that the threatened SEC enforcement proceeding fits squarely within this language. Harbor argues that the court need not even reach the above language unless the earlier requirement of a claim is met. The court does not find the insuring clause entirely clear and thus interprets it against Harbor. Further, coverage here is consistent with the court's earlier ruling during the trial of other counts where the court instructed the jury that:

Continental must prove that [the loss was suffered] in response to claims of 'wrongful acts' that were *actually made or threatened* against the five individual defendants.

Jury Instruction # 13 (emphasis added). Insurance coverage is accordingly co-extensive with Continental's power to indemnify which best effectuates the purpose of the insurance policy.

C. Indemnification of Continental Officers

Harbor also argues that Continental did not really

indemnify the officers and directors because Continental paid the legal fees directly. This argument is similar to other arguments previously raised in this suit and is similarly rejected. The money was clearly paid on behalf of the officers and directors.

D. Within the Policy Period

**\*5** Finally, Harbor argues that some of the claimed wrongful acts fell outside of the policy period. Continental claims that all the acts occurred within the policy period but the effects of those acts took place afterward. The court agrees with Continental that because the "wrongful acts" allegedly committed by the individuals targeted by the SEC were committed before August 8, 1984, there is coverage under the Harbor policy.

> FN1. The parties dispute the impetus for the SEC investigations.

Not Reported in F.Supp., 1989 WL 152648 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:85CV07081 (Docket) (Aug. 09, 1985)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

· than against, or evidence that inclines the mind to belief but leaves some room for doubt. **3.** affording ground for belief. [1350–1400; ME < L *probābilis* likely, capable of standing a test, equiv. to *probā(re)* to test (see PROBE) + *-bilis* -BLE]

**prob′able cause′**, *Law.* reasonable ground for a belief, as in a criminal case, that the accused was guilty of a crime, or, in a civil case, that grounds for the action stated: used esp. as a defense to an action for malicious prosecution. [1670–80]

**prob′able er′ror**, *Statistics.* a quantity formerly used as a measure of variability: equal to 0.6745 times a standard deviation. A normally distributed population has half of its elements within one probable error of the mean. [1805–15]

**prob·a·bly** (prob′ə blē), *adv.* in all likelihood; very likely: *He will probably attend.* [1525–35; PROBABLE + -LY]

**pro·band** (prō′band), *n. Genetics.* a patient who is the vital member of a family to come under study. Also called **propositus**. [1925–30; < L *probandus*, gerundive of *probāre* to test, PROBE]

**pro·bang** (prō′bang), *n. Surg.* a long, slender, elastic rod with a sponge, ball, or the like, at the end, to be introduced into the esophagus or larynx, as for removing foreign bodies, or for introducing medication. [1650–60; orig. (by assoc. with PROBE) of *provang*, unexplained coinage of the inventor]

**pro·bate** (prō′bāt), *n., adj., v., -bat·ed, -bat·ing.* —*n. Law.* **1.** the official proving of a will as authentic or valid in a probate court. **2.** an officially certified copy of a will so proved. —*adj.* **3.** of or pertaining to probate or a probate court. —*v.t.* **4.** to establish the authenticity or validity (of a will). **5.** *Law.* to put (an offender) on probation. [1400–50; late ME *probat* < L *probātum* a thing proved, n. use of neut. ptp. of *probāre* to test and find good; see PROBE, -ATE¹]

**pro′bate court′**, a special court with power over administration of estates of deceased persons, the probate of wills, etc. [1720–30, *Amer.*]

**pro·ba·tion** (prō bā′shən), *n.* **1.** the act of testing. **2.** a testing or trial of a person's conduct, character, qualifications, or the like. **3.** the state or period of such testing or trial. **4.** *Law.* **a.** a method of dealing with offenders, esp. young persons guilty of minor crimes or first offenses, by allowing them to go at large under supervision of a probation officer. **b.** the state of having been conditionally released. **5.** *Educ.* a trial period or condition of students in certain educational institutions who are being permitted to redeem failures, misconduct, etc. **6.** the testing or trial of a candidate for membership in a religious body or order, for holy orders, etc. **7.** *Archaic.* proof. [1375–1425; late ME *probacion* < L *probātiōn-* (s. of *probātiō*) See PROBATE, -ION] —**pro·ba′tion·al**, **pro·ba′tion·ar·y** (-shə ner′ē), *adj.* —**pro·ba′tion·al·ly**, *adv.*

**pro·ba·tion·er** (prō bā′shə nər), *n.* a person undergoing probation or trial. [1595–1605; PROBATION + -ER¹] —**pro·ba′tion·ar·ship′**, *n.*

**pro·ba·tion of′fic·er**, an officer who investigates and reports on the conduct of offenders who are free on probation. [1895–1900, *Amer.*]

**pro·ba·tive** (prō′bə tiv, prob′ə-), *adj.* **1.** serving or designed for testing or trial. **2.** affording proof or evidence. Also, **pro·ba·to·ry** (prō′bə tôr′ē, -tōr′ē). [1425–75; late ME < ME *probatif* < L *probātīvus* of proof. See PROBATE, -IVE] —**pro′ba·tive·ly**, *adv.*

**probe** (prōb), *v., probed, prob·ing, n.* —*v.t.* **1.** to search into or examine thoroughly; question closely: *to probe one's conscience.* **2.** to examine or explore with a probe. —*v.i.* **3.** to examine or explore with or as if with a probe. —*n.* **4.** the act of probing. **5.** a slender surgical instrument for exploring the depth or direction of a wound, sinus, or the like. **6.** an investigation, esp. by a legislative committee, of suspected illegal activity. **7.** *Aerospace.* See **space probe**. **8.** a projecting, piplike device on a receiving aircraft used to make connection with and receive fuel from a tanker aircraft during refueling in flight. **9.** a device, attached by cord to an oven, that can be inserted into roasts or other food so that the oven shuts off when the desired internal temperature of the food is reached. **10.** *Biol.* any identifiable substance that is used to detect, isolate, or identify another substance, as a labeled strand of DNA that hybridizes with its complementary RNA or a monoclonal antibody that combines with a specific protein. [1555–(n.) < ML *proba* examination, LL: test, deriv. of *probāre* (see PROVE); (v.) partly deriv. of the n., partly < LL *probāre*. See PROOF] —**probe′a·ble**, *adj.* —**prob′er**, *n.* —**Syn. 1.** investigate, scrutinize.

**pro·ben·e·cid** (prō ben′ə sid), *n. Pharm.* a white, crystalline, water-insoluble powder, C₁₃H₁₉NO₄S, used chiefly in the treatment of gout. [1945–50; PRO(PYL) + (BEN)E + -(A)CID]

**pro·bie** (prō′bē), *n. Informal.* a probationer, esp. a firefighter who has recently joined a department. [1895–00; PROB(ATIONARY) or PROB(ATION) + -IE]

**pro·bit** (prob′it), *n. Statistics.* a normal equivalent deviate increased by five. [1930–35; PROB(ABILITY) + (UN)IT]

**pro·bi·ty** (prō′bi tē, prob′i-), *n.* integrity and uprightness; honesty. [1505–15; < L *probitās* uprightness, equiv. to *prob(us)* upright + *-itās* -ITY]

**prob·lem** (prob′ləm), *n.* **1.** any question or matter involving doubt, uncertainty, or difficulty. **2.** a question proposed for solution or discussion. **3.** *Math.* a statement requiring a solution, usually by means of a mathematical operation or geometric construction. **4.** no problem, (used as a conventional reply to a request or to express confirmation, affirmation, or gratitude). —*adj.* **5.** difficult to train or guide; unruly: *a problem child.* **6.** *Literature.* dealing with choices of action difficult either for an individual or for society at large: *a problem play.* [1350–1400; ME *probleme* < L *problēma* < Gk *próblēma* orig., obstacle, (akin to *probállein* to throw or lay before), equiv. to *pro-* PRO-² + *-blē-*, var. s. of *bállein* to throw (cf. PARABOLA) + *-ma* n. suffix of result] —**Syn. 1, 2.** puzzle, riddle, enigma. —**Ant. 1.** certitude.

**prob·lem·at·ic** (prob′lə mat′ik), *adj.* of the nature of a problem; doubtful; uncertain; questionable. Also, **prob′lem·at′i·cal.** [1600–10; < LL *problēmaticus* < Gk *problēmatikós*, equiv. to *problēmat-* (s. of *próblēma*) PROBLEM + -ikos -IC] —**prob′lem·at′i·cal·ly**, *adv.* —**Syn.** unsure, indeterminate, unsettled, dubious, ambiguous.

**prob·lem·at·ics** (prob′lə mat′iks), *n.pl.* the uncertainties or difficulties inherent in a situation or plan. [1955–60; see PROBLEMATIC, -ICS]

**pro bo′no pu′bli·co** (prō bō′nō pŭb′li kō′; *Eng.* prō bō′nō pub′li kō′), *Latin.* for the public good or welfare.

**pro·bos·ci·date** (prō bos′i dāt′), *adj.* having a proboscis. [1820–30; < L *proboscid-* (s. of *proboscis*) + -ATE¹]

**pro·bos·cid·e·an** (prō′bə sid′ē ən, -bō-, prō bos′i-dē′ən), *adj.* **1.** pertaining to or resembling a proboscis. **2.** having a proboscis. **3.** belonging or pertaining to the mammals of the order Proboscidea, characterized by a flexible trunk formed of the nostrils and upper lip, large tusks, a massive body, and columnar legs, comprising the elephant and the now-extinct mammoth and mastodon. —*n.* **4.** a proboscidean animal. Also, **pro·bos·cid′i·an**. [1825–35; < NL *Proboscide(a)* order name (L *proboscid-* (s. of *proboscis* PROBOSCIS) + -ea, neut. pl. of -eus adj. suffix; see -EOUS) + -AN]

**pro·bos·cis** (prō bos′is, -kis), *n., pl. -bos·cis·es, -bos·cid·es** (-bos′i dēz′). **1.** the trunk of an elephant. **2.** any long flexible snout, as of the tapir. **3.** Also called **beak**, the elongate, protruding mouth parts of certain insects, adapted for sucking or piercing. **4.** any of various elongate feeding, defensive, or sensory organs of the oral region, as in certain leeches and worms. **5.** *Facetious.* the human nose, esp. when unusually long or prominent. [1570–80; < L < Gk *proboskís* elephant's trunk, lit., feeder, equiv. to *pro-* PRO-² + *bósk(ein)* to feed + -is (s. *-id-*) n. suffix]

**probos′cis mon′key**, a reddish, arboreal monkey, *Nasalis larvatus*, of Borneo, the male of which has a long, flexible nose: an endangered species. [1785–95]

**pro·bus·ing** (prō′būs′ing), *adj.* favoring or advocating legislation that requires the busing of students from one school district to another to achieve racial balance in public schools. Also, **pro′bus·sing**.

**proc.,** **1.** procedure. **2.** proceedings. **3.** process. **4.** proclamation. **5.** proctor.

**pro·caine** (prō kān′, prō′kān), *n. Pharm.* a compound, C₁₃H₂₀N₂O₂, used chiefly as a local and spinal anesthetic. [1915–20; PRO-¹ + (CO)CAINE]

**procaine′ am′ide**, *Pharm.* a white, crystalline compound, C₁₃H₂₁ON₂, used in the treatment of cardiac arrhythmias. [1945–50]

**pro·cam·bi·um** (prō kam′bē əm), *n. Bot.* the meristem from which vascular bundles are developed. Also called **provascular tissue**. [1870–75; < NL; see PRO-¹, CAMBIUM] —**pro·cam′bi·al**, *adj.*

**pro·car·y·ote** (prō kar′ē ōt′, -ē ət), *n.* prokaryote. [1960–65] —**pro·car·y·ot·ic** (prō kar′ē ot′ik), *adj.*

**pro·ca·the·dral** (prō′kə thē′drəl), *n.* a church used temporarily as a cathedral. [1865–70; PRO-¹ + CATHEDRAL]

**pro·ce·dur·al** (prə sē′jər əl), *adj.* **1.** of or pertaining to a procedure or procedures, esp. of a court of law, legislative body, or law enforcement agency. —*n.* **2.** See **police procedural**. [1885–90; PROCEDURE + -AL¹] —**pro·ce′dur·al·ly**, *adv.*

**pro·ce·dure** (prə sē′jər), *n.* **1.** an act or a manner of proceeding in any action or process; conduct. **2.** a particular course or mode of action. **3.** any given mode of conducting legal, parliamentary, or other business, esp. litigation and judicial proceedings. **4.** *Computers.* **a.** the sequence of actions or instructions to be followed in solving a problem or accomplishing a task. **b.** Also called **subprogram**, a group of statements that may be used at one or more points in a computer program. [1605–15; < F *procédure*. See PROCEED, -URE] *adj.* —**Syn. 3.** management. **2.** operation, maneuver, transaction. See **process**.

**pro·ceed** (v. prə sēd′; n. prō′sēd), *v.i.* **1.** to move or go forward or onward, esp. after stopping. **2.** to carry on or continue any action or process. **3.** to go on to do something. **4.** to continue one's discourse. **5.** *Law.* to

begin and carry on a legal action. **b.** to take legal action (usually fol. by *against*). **6.** to be carried on, as an action or process. **7.** to go or come forth; issue (often fol. by *from*). **8.** to arise, originate, or result (usually fol. by *from*). —*n.* **9. proceeds**, **a.** something that results or accrues. **b.** the total amount derived from a sale or other transaction: *The proceeds from the deal were divided equally among us.* **c.** the profits or returns from a sale, investment, etc. **10.** *Archaic.* proceeds. [1350–1400; ME *proceede* < L *prōcēdere*. See PRO-¹, CEDE] —**pro·ceed′er**, *n.*

—**Syn. 1.** progress, continue, pass on. See **advance.** **7.** emanate. **8.** spring, ensue. —**Ant. 1.** recede.

**pro·ceed·ing** (prə sē′ding), *n.* **1.** a particular action or course or manner of action. **2. proceedings**, a series of activities or events; happenings. **3.** the act of a person or thing that proceeds: *Our proceeding down the mountain was hindered by mud slides.* **4. proceedings**, a record of the doings or transactions of a fraternal, academic, etc., society. **5. proceedings**, *Law.* **a.** the instituting or carrying on of an action at law. **b.** a legal step or measure: *to institute proceedings against a person.* [1375–1425; late ME *proceding*, PROCEED, -ING¹] —**Syn. 1, 2, 4.** See **process**.

**pro·ce·leus·mat·ic** (pros′ə lōŏs mat′ik, prō′sə-), *adj.* **1.** inciting, animating, or inspiring. **2.** *Pros.* **a.** noting a metrical foot of four short syllables. **b.** pertaining to or consisting of feet of this kind. —*n.* **3.** *Pros.* a proceleusmatic foot. [1700–10; < LL *proceleusmaticus* < Gk *prokeleusmatikós* lit., calling for incitement, equiv. to *pro-* PRO-² + *keleusmat-* (s. of *kéleusma* summons, deriv. of *keleúein* to rouse to action) + -ikos -IC]

**pro·cel·las** (prō sel′əs), *n.* (used with a singular v.) pucellas. [said to be < It *procello*]

**pro·cel·lous** (prō sel′əs), *adj.* stormy, as the air. [1640–50; < L *procellōsus* stormy, equiv. to *procell(a)* storm + -ōsus -OUS]

**pro·cer·coid** (prō sûr′koid), *n. Zool.* an elongate larval stage of some tapeworms that usually develops in the body of a freshwater copepod. Cf. **plerocercoid**. [1900–05; PRO-¹ + CERCO- + -OID]

**pro·cess** (pros′es or, esp. Brit., prō′ses), *n., pl. proc·ess·es** (pros′es iz, -ə siz, -ə sēz′ or, esp. Brit., prō′-ses′ə3-), *v., adj.* —*n.* **1.** a systematic series of actions directed to some end: *to devise a process for homogenizing milk.* **2.** a continuous action, operation, or series of changes taking place in a definite manner: *the process of decay.* **3.** *Law.* **a.** the summons, mandate, or writ by which a defendant or thing is brought before court for litigation. **b.** the whole course of the proceedings in an action at law. **4.** *Photog.* photomechanical or photoengraving methods collectively. **5.** *Biol., Anat.* a natural outgrowth, projection, or appendage: *a process of a bone.* **6.** the action of going forward or on. **7.** the condition of being carried on. **8.** course or lapse, as of time: *the conk′* (defs. 1, 2). —*v.t.* **10.** to treat or prepare by a particular process, as in manufacturing. **11.** to deal with (papers, records, etc.) by systematically organizing them, recording or making notations on them, following up with appropriate action, or the like: *to process mail.* **12.** to require (someone) to answer questionnaires, pass various tasks, and sometimes to undergo physical or aptitude classification examinations before the beginning or termination of a period of service: *The army processed all personnel entering or leaving the service.* **13.** to convert (an agricultural commodity) into marketable form by a special process, as preparation. **14.** to institute legal process against. **15.** to serve a process on. —*adj.* **16.** *Computers.* to carry out operations (data or programs). **17.** conk′ (def. 3). —*v.i.* **18.** to undergo the activities involved in processing papers: *The recruits expected to process in four days.* —*adj.* **19.** prepared or modified by an artificial process, as cheese. **20.** noting, pertaining to, or involving photochemical or photoengraving methods: *a process color.* **21.** *Informal.* of or pertaining to hair that has been conked. **22.** *Motion Pictures.* created by or involving process cinematography; a moving background. See **process screen**. [1275–1325; ME *proces* (n.) < OF < L *prōcessus* a going forward, equiv. to *-tus* suffix (for *pp.*) + *cēdere* to yield (see CEDE) + -tus suffix of action; see CESSION] —**pro·ces·su·al** (prō sesh′ōŏ əl), *adj.; Brit., pro′-), *adj.* —**Syn. 1.** operation. PROCESS, PROCEDURE, PROCEEDING apply to something that goes on or takes place. PROCESS is a series of progressive and interdependent steps by which an end is attained: *a chemical process.* PROCEDURE usually implies a formal or set order of doing things, a method of conducting affairs: *parliamentary procedure.* PROCEEDING (usually in *pl.*) applies to what goes on or takes place on a given occasion or to the records of it: *Proceedings of the Royal Academy of Science.* —**Pronunciation.** The word PROCESS, an early 14th-century French borrowing, has a regularly formed pl. that adds *-es* to the singular. This plural, as with words like *recesses* and *successes*, has traditionally been pronounced (-iz): (pros′es iz, prō′sess-) or (prō′sə-). Recent years have seen the increasing popularity of an (-ēz′) pronunciation for PROCESSES, probably mistaken analogy with such plurals as *theses* and *theses*, with which it has no connection. This -ēz pronunciation is common among younger educated speakers.

**proc′ess cinematog′raphy**, *Motion Pictures.* cinematography in which the main or foreground scene is superimposed on or combined with a separately filmed background action or special effects, as to produce special visual effects.

**proc′ess cost′ing**, *Accounting.* a method of assigning costs to production processes in

estate is distributed. 11 USCA § 503(b). See *general administrative expense* under EXPENSE.

**administrative freeze.** *Bankruptcy.* The refusal by a debtor's bank to permit withdrawals from the debtor's bank account after the bank learns that the debtor has filed bankruptcy, usu. because the debtor owes money to the bank in addition to maintaining funds on deposit.

**administrative hearing.** An administrative-agency proceeding in which evidence is offered for argument or trial.

**administrative interpretation.** See INTERPRETATION.

**administrative law.** The law governing the organization and operation of the executive branch of government (including independent agencies) and the relations of the executive with the legislature, the judiciary, and the public. ● Administrative law is divided into three parts: (1) the statutes endowing agencies with powers and establishing rules of substantive law relating to those powers; (2) the body of agency-made law, consisting of administrative rules, regulations, reports or opinions containing findings of fact, and orders; and (3) the legal principles governing the acts of public agents when those acts conflict with private rights.

> "Administrative law deals with the field of legal control exercised by law-administering agencies other than courts, and the field of control exercised by courts over such agencies." Felix Frankfurter, *The Task of Administrative Law*, 75 U. Pa. L. Rev. 614, 615 (1927).

***international administrative law.*** **1.** The internal law and rules of international organizations. **2.** The substantive rules of international law that directly refer to the administrative matters of individual states. **3.** Domestic administrative law specifically concerned with international problems or situations. — Also termed *administrative international law.*

**administrative-law judge.** An official who presides at an administrative hearing and who has the power to administer oaths, take testimony, rule on questions of evidence, and make factual and legal determinations. 5 USCA § 556(c). — Abbr. ALJ. — Also termed *hearing examiner; hearing officer; trial examiner.*

**Administrative Office of the United States Courts.** A federal agency that carries out the nonjudicial business of the federal courts. ●

The Administrative Office collects statistics on the courts, supervises the administrative personnel, disburses the payroll, and performs other similar functions.

**administrative officer.** See OFFICER (1).

**administrative order.** See ORDER (2).

**administrative procedure.** See PROCEDURE.

**Administrative Procedure Act. 1.** A federal statute establishing practices and procedures to be followed in rulemaking and adjudication. ● The Act was designed to give citizens basic due-process protections such as the right to present evidence and to be heard by an independent hearing officer. **2.** A similar state statute.

**administrative proceeding.** A hearing, inquiry, investigation, or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative. — Also termed *evidentiary hearing; full hearing; trial-type hearing; agency adjudication.*

**administrative process. 1.** The procedure used before administrative agencies. **2.** The means of summoning witnesses to an agency hearing.

**administrative remedy.** See REMEDY.

**administrative review.** See REVIEW.

**administrative rule.** A broadly applicable agency statement that interprets a law or policy or describes the agency's requirements.

**administrative rulemaking.** See RULEMAKING.

**administrative search.** See SEARCH.

**administrative tribunal.** An administrative agency before which a matter may be heard or tried, as distinguished from a purely executive agency; an administrative agency exercising a judicial function.

**administrative warrant.** See WARRANT (1).

**administrator** (ad-**min**-ə-stray-tər). **1.** A person appointed by the court to manage the assets and liabilities of an intestate decedent. ● This term once referred to males only (as opposed to *administratrix*), but legal writers now generally use *administrator* to refer to someone of either sex. Cf. EXECUTOR (2).